Kilty, Chancellor.
This case standing ready for decision, and being submitted, the proceedings were read and considered. Whereupon it is Decreed, that such part of the property in-the proceedings mentioned, as may be sufficient to pay the sums due from William Mitchell to the heirs of James Mitchell be sold; that James Wallace be, and he is hereby appointed trustee for making the said sale, &c. The terms of which sale shall be, that the purchaser shall give bond for the payment of the purchase money, with interest, within twelve months from the day of sale, &c. Provided, that the said trustee shall, in the first place, sell the part of the estate clear of and excluding the fishery called Cooley’s Fishery, mentioned in' the answer of Par- *588 her Mitchell, until the further order or decree of this.court in the premises.
On the 29th of April, 1812, an agreement in writing -was made and signed by all these defendants, except the infant defendant Ann. Mitchell, and filed, which, after • referring to this decree, proceeds, in these words: c Therefore we, the subscribers, heirs of William Mitchell, being desirous that the whole of the property mentioned in the proceedings aforesaid should be sold in the same manner and on the same terms as is mentioned in the said decree j do hereby authorize and request the said James Wallace, trustee aforesaid, to sell the whole of the property mentioned in the said proceedings, on the same terms ás is mentioned in said, decree; and we do hereby further authorize, and .request the honourable the Chancellor of Maryland, to ratify and confirm the said sale, when so, as aforesaid, made by the said trustee.’-
On the 22d of July, 1812, the trustee Wallace reported that, after having given notice of the-time, place, manner and terms of sale, as required, ‘ he caused the said property to be laid off in lots, and sold as follows, viz. Lots Nos. 1, 2, 3, 4 and 5, containing ten acres each, and lot No. 6, containing six acres, the said six lots being the whole of the tract called Convenience.. Lot No. 7, the tract called Herman’s Addition, and Betty’s Lot, containing sixty-two acres. Lot No. 8, the fishery called The Cove, with ten acres of land bounded as follows, to wit: Beginning, &c. &c., containing, and laid out for ten acres of land, more or less. Lot No. 9, the fishery called Barne’s Fishery, with five acres of land, bounded as follows, beginning,,&c. &c., containing five acres of land, more or less. Lot. No. 10, part of a tract of land called Rupulta, and known by the name of Barne’s Rupulta, beginning, &c. &c., containing one hundred and thirty-nine acres, including fifteen acres, heretofore laid off for Mrs. Dorset’s .dower, and not sold with this lot.. Lot. No. 11, part of a tract of land called Rupulta, and known by the name of Gover’s Rupulta, beginning for the same at the second boundary of the whole tract called Rupulta, and running thence, &c. &c. • to the beginning, and laid out for one hundred and forty-three acres.’ The trustee further says, in his report, that the day being .rainy, he postponed the sale to the 7th day of May, 1812, of which he gave notice,when he attended, and ‘proceeded to sell said property in the following manner, viz. the said trustee first exposed for sale lot No. 1, *589 and William B. Stokes .became the highest bidder and purchaser thereof, by bidding therefor $41 per acre, amounting, in the whole, to the sum of $410.’ That he then offered for sale, and sold lots Nos. 2 and 3, of which, with lot No. 1, it was agreed, by the bidders for them, that Samuel Hughes should be let in as the purchaser. That of lot No. 4, William Cole became the purchaser at $43 per acre; and of lot No. 5 at $34 50 per acre. ‘ The trustee then offered for sale lot No. 6, and said William Cole became the highest bidder and purchaser thereof, by bidding therefor the sum of $20 per acre, amounting, in the whole, for said lot, to the sum of $120.’ The trustee further says that he sold lot No. 7 to Abraham Jarrett; No. 8 to Samuel Hopkins; No. 9 to Joseph Hopkins; No. 10 to Parker Mitchell; and then the trustee concludes his report in these words. ‘ The said trustee then offered for sale lot No. 11, and Freeborn Brown became the highest bidder and purchaser thereof, by bidding therefor $23 per acre, amounting, in the whole, to the sum of $3,289; and the said Freeborn Brown now refuses to give bond for the payment of the purchase money. The said trustee further states that all the heirs of William Mitchell, and those with whom they have intermarried, except —-Mitchell, who is a minor, having expressed a great desire that the whole of the property mentioned in the proceedings of their suit with the heirs of James Mitchell, except their interest. in Cooley’s Fishery, should be sold under the decree aforesaid, and the trustee foreseeing no inconveniency that could result either to the heirs of William Mitchell, or the purchaser or purchasers of said property, in case the whole of the sales should not be ratified, did sell the whole of said property in the manner herein before stated.’
Upon which, on the 27th of February, 1813, the usual order nisi was passed; and, no cause having been shewn, the sales, as thus made and reported,' were, on the 15th of July, 1813, finally ratified and confirmed. Some time after the trustee had thus made his report of the sales, Freeborn Brown gave his bond wdth William Brown as his surety for the payment of the purchase money; and Freeborn Brown was soon after put into the actual possession of lot No. 11, as the purchaser thereof, by the trustee.
After which William Cole, by his petition, stated, that he had purchased as reported by the trustee; but that the tract of land called Convenience, of which the lots he purchased were parts, was sold by the acre, and that it was distinctly understood, at the time of the sale, that a deduction should be made for any deficiency j *590 and that he being the last purchaser, the deficiency all fell on him, as he was to take the residue. On which petition the trustee Wallace certified as follows, that on the day of sale he made it known, ‘that, if upon an accurate survey it should be found, that the tract called Convenience did not contain fifty-six acres, that the deficiency should be deducted from the last lot of said tract sold, containing six acres, and the purchaser credited with the price. Mr. William, Cole was the purchaser, and the price per acre will appear by reference had to my report. The said tract has been since surveyed by Mr. Osborn, who certifies, that it contains only fifty-four acres, which I believe to be correct.’
22d February, 1814.
Kilty, Chancellor.—
Ordered, that the trustee credit the principal of the petitioner’s bond with the price of two acres of lot No. 6, viz. $40.
The auditor in a report bearing date on the 17th of June, 1814, said, that he had, at the request of the said Abraham Jarrett, stated an account between the estate of the said William Mitchell, deceased, and the heirs at law of James Mitchell, deceased, in which the intestate William’s estate was charged with the valuation of the intestate James’ estate. William’s estate was then credited by one-sixth of that sum as the portion of Martin, the eldest heir of the intestate James, and also by one-twelfth of that sum, being the one-half of the portion of Bennet, another heir of the intestate James, which it was stated, in the defendant Parker Mitchell’s answer, were purchased by the intestate William in his life-time; but whether those portions had been paid for, did not appear; there being no evidence upon the subject. The auditor further said, that he had then apportioned the balance, $7,372 50, due from the estate of the intestate William, to Harriet Mitchell, one-sixth; to James and Aquila Mitchell, the complainants, one-sixth each; and to Parker Mitchell, who alleged in his answer, that he was the purchaser of Kent Mitchell’s portion, and the remaining half of Bennet Mitchell’s portion, their shares accordingly; but that.there was no proof of the purchase or payment for those portions. That all these claims so ascertained against the estate of the.intestate William, including interest to the day of the trustee’s sale, amounted to $8,321 13. The auditor further reported, that Martin Mitchell, Bennet Mitchell, and Kent Mitchell, whose interests seemed to be materially affected by these proceedings, were not parties ; and; therefore, respectfully submitted, whether they ought *591 not, in some shape, to have notice of the complainants’ application and the allegations of the defendants.
22d June, 1815.
Kilty, Chancellor.—
Ordered, that the claims against the said estate, which are now, or may be exhibited, be decided on during the sittings of the ensuing July term, on application. The trustee is desired to have a copy of this order published three weeks in the American, and to forward a certificate of its publication, and the expense, which will be allowed.
A copy of this order having been published as required; the auditor, by a report dated on the 27th of February, 1816, said, that he had stated an account between the estate of William Mitchell, deceased, and the trustee, in which the proceeds of the estate were first applied to the payment of the trustee’s allowance for commission and expenses, the costs in this court, and the several claims as heretofore stated and reported; and the balance was equally divided between the heirs at law, of the said William Mitchell.
29th February, 1816.
Kilty, Chancellor.
Notice having been given, as directed by the order of 22d June, 1815, and no application having been made in support of the objections suggested in the auditor’s first report; and the auditor having appropriated the proceeds by this statement and report; the same are confirmed, and the proceeds are directed to be applied accordingly, with interest on the commission and dividends, in proportion as it has been or may be received. (b)
No further proceedings appear to have been had in this case by any of the parties.
The first of these cases of Brown against Wallace, was instituted by a bill filed in Harford County Court, on the 8th of May, 1818, by Freeborn Brown and William Brown, against James Wallace. This bill stated, that the plaintiff Freeborn, purchased the lands of the defendant, as mentioned in his report, in the before mentioned case of Mitchell against Mitchell, in the High Court of Chancery, in pursuance of the decree in that case, and of the written authority of the 29th of April, 1812; that the plaintiff Freeborn, under a belief that the land so purchased by him, did contain the number of acres as stated, gave his bond, with the plaintiff *592 William, as his surety for the purchase money; upon which bond, after it became due, the defendant Wallace, brought suit and obtained judgment, from which these plaintiffs appealed, and the judgment was affirmed by the Court of Appeals, at June term, 1817. That the plaintiff Freeborn, had paid to this defendant, the trustee, on the 18th of January, 1818, $900, in part satisfaction of the judgment. The bill then further stated, that this plaintiff Freeborn, was not put into possession of the land so purchased by him until the month of November next after the day of sale; that the tract had been found to contain only one hundred and twenty-six acres, three-quarters and twenty-four perches; and therefore, he claims an allowance for deficiency; that the heirs of William Mitchell, deceased, had by a deed dated on the 14th of September, 1815, sold and conveyed a part of this very land to Carvill Cooley, and Charles Cooley, who had taken possession accordingly; that a suit in chancery had been instituted by Samuel Gover, who claimed by a title paramount, against the heirs of William Mitchell, deceased, for the recovery of this land; and that an action of ejectment was about to be brought by one Philip Gover, for the recovery of the same land, &c. Whereupon the bill prayed for an injunction to stay execution upon the said judgment. And an injunction was granted accordingly, as prayed.
To this bill, the defendant Wallace, answered, and admitted the proceedings in the High Court of Chancery as stated; and said, that he had only sold to the plaintiff Freeborn, the interest which the heirs of James Mitchell and William Mitchell, had in the land; and that he did not pretend to warrant the title; that the plaintiff Freeborn, was put into possession soon after he gave bond for the purchase money; that at the time of sale, a plot of the land was exhibited, and the sale was made near the land, which was shewn to the plaintiff Freeborn, so that he could not have been mistaken with regard to it; that this trustee did not sell to the plaintiff Freeborn, any land claimed by the Cooleys ; and that the plaintiff Freeborn, was told of, and had full knowledge of the claim of the Govers, on the day of the sale.
These plaintiffs, by a supplemental bill, filed on the 17th of August, 1824, stated, that Robert Gover had obtained judgment against them, and turned them out of possession of the land purchased, by the plaintiff Freeborn. In answer to which, the defendant Wallace, alleged, that the said judgment had been obtained entirely by the negligence and default of the plaintiffs.
*593 After which, Kent Mitchell, who, although not. so expressly-stated, appears to have been one of the heirs.of William Mitchell, deceased, by his petition, not on oath, stated, that he was very much interested in the sum of money which was the subject of controversy ; a large proportion of which was to be paid to him, when collected, by the said Wallace, who was a mere trustee; and therefore, prayed to be allowed to come in, answer, &c. Upon which, it was, on the 20th of August, 1824, by Archer, C. J. Ordered, that the petitioner be permitted to appear, answer, and defend, as prayed. Under this leave, on the 25th of October, 1824, Kent Mitchell filed his answer, in which he set forth and relied upon various facts and circumstances, which had been before in substance stated and relied on by the defendant Wallace. After which, this defendant Kent Mitchell, without oath, or stating any reasons, merely prayed for leave to amend his answer. Upon which it was, on the 6th of November, 1824, by Archer, C. J. Ordered, that leave be given to amend the answer, as prayed. Under which leave, this defendant, on the 5th of March, 1825, put in an amended answer, setting forth some few additional facts', but none having any material bearing upon the questions afterwards submitted for determination.
The second of the cases of Brown against Wallace, was also commenced in Harford County Court, by a bill filed on the 5th of March, 1825, by Freeborn Brown and William Brown, against James Wallace. ■ This bill stated the same facts and circumstances as in the first bill, and alleged, that the trustee Wallace, was wholly unable to make a good and valid title to Freeborn Brown, for the land so purchased by him. -Whereupon it was prayed, that the said contract between the plaintiffs and the defendant, respecting the property in the proceedings mentioned, might be set aside, vacated, cancelled, &c. To this second bill, the defendant Wallace, put in an answer, substantially similar to that which he had made to the first bill.
After hearing the motion to dissolve the injunction, the matter was considered, and the motion was overruled. On the 13th of Mareh,-1826, Freeborn Brown’s death was suggested ; and Mary B. Brown, his executrix and devisee, was admitted as a plaintiff in his stead. These cases were then removed to this court, under the act of 1824, ch. 196, and the proceedings all filed here on the 8th of May, 1827. After which, on application, a survey was ordered, made,, and plots returned; testimony was taken and *594 brought in; and some other proceedings were had; any particular account of which is, however, deemed unnecessary. Upon all which, these several cases were together brought before the court.
bth July, 1830.
Bland, Chancellor.
The parties having agreed, that these two cases should be heard together and consolidated ; and there being a convenience in having them so associated ; and as it may prevent confusion, and save repetition, I shall therefore treat them as one suit. And that no equity, nor any real ground of relief may be lost to this purchaser, I shall consider all that is alleged in these several bills as if it had been regularly introduced into the suit originally instituted in this court, by a petition in which every thing stated in those bills had been fully set forth. And I shall then consider whether these bills, filed in a court of concurrent jurisdiction, ought not to be dismissed, even supposing, that they had presented a fit subject for equitable relief, because of their being incompatible with the proceedings in this court.
The first position assumed by this purchaser is, that he did not obtain possession until several months after the day of sale ; and, therefore, that so much of the judgment against him as gives interest from that time is against equity, and ought not to be allowed.
It is a general rule as to sales under decrees of this court, that the purchaser always pays interest, according to the terms of the decree, from the day of sale, whether he gets possession or not. His getting possession is, in no case, allowed to be a condition precedent to the payment of either principal or interest of the purchase money. The purchaser is presumed to regulate his bidding with a view to the known powers and rules of the court as to delivering possession. There is, therefore, nothing in this objection, even supposing this purchaser himself to have been in no default; and, by promptly giving his bond, to have so clothed himself with an equity to demand a delivery of possession immediately after the sale had been finally ratified. But looking to his evasion or negligence, this objection comes with an ill grace from him. (c)
The next position assumed by this purchaser is, that because the heirs of the late William Mitchell have, since he bought, sold a part of the same land he purchased to Carvel and Charles Cooley, by a deed dated on the 14th of September, 1815, that therefore he should not be compelled to pay the purchase money.
*595 Of this, however, there is no clear proof. But suppose the fact to be so; it would be strange indeed if any party to a suit, after the court had decreed his land to be sold, should be able to defeat the sale ; or could afford to the purchaser a sufficient reason for not paying the purchase money, by merely making a conveyance of the land to some third person, so as to give to such third person a pretext of title on which to bring suit against the purchaser from the court. It is clear, that the whole title of the heirs of the late William Mitchell to the lands embraced by the deed of the 14th of September, 1815, was sold by the trustee, or that it was not. If it was sold, then the subsequent purchaser from those heirs can have no title; and the title of the purchaser under this court’s decree cannot, in this respect, be impeached, (d) If, on the other hand, their title to the lands described in that deed was not sold by the trustee to Freeborn Brown, then he has nothing to complain of; and the whole affair is entirely foreign to the matter now under consideration. This objection is therefore utterly groundless.
Another point upon which this purchaser rests is, that he bought by the acre, and that the trustee represented the tract which he, Brown, bought, called Governs Rupulta, as containing one hundred and forty-three acres, when in truth it did not contain quite one hundred and twenty-seven acres; and therefore, that he ought to have a deduction to the amount of this deficiency.
It is not alleged, that the deficiency is in that part of the lot which was the inducement to the purchase; or that it is of such a nature as materially to vary the contract, it is merely a claim for an allowance on account of short measure; as if by the terms of the contract a measurement was absolutely necessary to reduce it to certainty and to ascertain the amount of the purchase money to be paid.
The position here taken rests upon an assumption of the fact, that the land was sold only by the acre; or in lots of an indefinite size at $23 per acre. But according to the trustee’s report, such was not the fact; and there is no satisfactory proof that it was sold in any other manner than as there stated. In the absence of clear proof of mistake, misrepresentation or fraud, the ratified report of the trustee is the only evidence of the contract by which the court can allow itself to be governed; and unless it be so impeached, it must be considered as conclusive upon the subject (e) *596 It is stated by the trustee, that he caused the lauds to be laid off into several distinct parcels, described by metes and bounds and number of acres ; and that he sold them in that manner; each parcel as a separate body of land for an amount ascertained by the number of acres said to be contained within the specified metes and bounds; and not by the acre alone, or in lots Nos. 1,2, 3, See. of an indefinite size, without reference to boundary, or other more particular description, at so much by the acre, so as to render a measurement indispensably necessary to ascertain the amount of the purchase money. In England, a commission may be issued to ascertain the quantity where .the contract is to pay by the acre, and the quantity is uncertain; (f) but here it has always been the practice of this court, where its trustee has made a sale at so much per acre, as a matter of course, to order a survey to ascertain the quantity of land and thereby the amount of the purchase money, (g)
But that these several parcels of land were sold by the tract, and were distinctly understood to be sold in that manner by all the bidders present at the sale, is clearly shewn by the explanations in relation to lot No. 6, which was sold by the acre as a residuum of the tract called Convenience ; but all the other lots, from No. 1 to No. 11, weré sold by the tract; all of them lying within certain specified metes and bounds made known to the bidders at the time of the sale. After thus describing one of those lots, the number of acres is specified with the usual reservation, ‘more or less;’ and lot No. 11, after being so described, is said to have been ‘laid out for one hundred and forty-three acres.’ And in each case the purchase money is summed up, and the purchaser is reported as having agreed to give a designated sum total. What is meant in general by the phrase, ‘more or less,’ or ‘laid out for so much,’ in conveyances of land in reference to quantity seems to remain as yet unsettled. The proprietary’s instructions fixed it as a rule for the land office, as to grants from the state, that they should be allowed to cover no more than ten per cent; but there has been no rule established as to other grants or conveyances. (h)
There is, however, no direct and satisfactory proof of any deficiency in lot No. 11, as described and sold. It is not shewn. *597 that the boundaries by which the trustee sold that lot, do not embrace the whole number of acres which they were said to contain.
I am therefore of opinion, that this purchaser has failed to sustain this claim for an allowance for deficiency; in the first place, because the land was sold to him by the tract, and not by the acre; and in the next place, because in point of fact, he has shewn no deficiency within the designated boundaries.
This purchaser, Freeborn Brown, however, advances still further, he prays to have the whole sale to him rescinded; and to have so much of the purchase money as he has paid, returned to him. And this he asks upon two grounds, first, that although the decree of the 10th of March, 1812, restrained the sale to so much only, as should be sufficient to satisfy the claims therein mentioned; yet the trustee made sale of the whole of the interest of the heirs of the late William Mitchell, by virtue of a pretended power, dated on the 29th of April, 1812, from those heirs, to sell the whole, when in truth, several of them were minors, and incompetent to give any such power to sell; and the sale was ratified by the Chancellor under a mistaken impression, that those heirs were of full age, and able to convey; so that this lot No. 11, was disposed of, which otherwise would not have been sold.
The position here assumed is in direct opposition to the terms of the decree; of the trustee’s report; and of the instrument of the 29th of April, 1812. There is nothing upon the face of those documents, taken either separately or together, by which this position can be sustained. But Freeborn Brown must, in this respect, take upon himself one of two characters. He must stand either as a purchaser under what he calls the power of the 29th of April, 1812, or as a purchaser under the decree of this court. He cannot blend the two, and take advantage of both at the same time.
If he bought under the power, then he is a purchaser direct from the heirs of the late William Mitchell, and this court has no jurisdiction of the matter in any way whatever in this case. Those heirs, in that respect, were not under the control of this court; they were entirely free to sell any right or interest of theirs as they might think proper, either in person or by James Wallace as their attorney. But it is perfectly evident that they could not, by giving a power of attorney to James Wallace to sell for them, who was also at the same time acting as the agent or trustee of this court, thereby mingle any of their separate interests with the subject with *598 which the court was then dealing; they could not, thus uninvited, thrust their own individual interests into a cause which was under the direction of the court for the benefit of others as well as themselves. Therefore, in this view of the subject, the instrument of the 29th of April, 1812, must be deemed entirely foreign from the matter under consideration, (i)
If, on the other hand, Brown takes his stand as a purchaser from the court, then, on recurring to the decree and trustee’s report, it will be seen that the decree covers the whole subject, and that the trustee has confined himself strictly within the limits of the decree. The bill had stated that two of the heirs of the late William Mitchell were minors, and they had answered as such; the trustee had again incidentally reminded the Chancellor that one of them at least was then a minor, in that part of his report in which he speaks of their desire to have all the land sold. After this, it seems strange to object that the Chancellor had ratified the sale under a mistaken impression that all those heirs were of full age; on the contrary, it is manifest that, from beginning to end, the Chancellor was perfectly aware that he was dealing with the property of infants. There could have been no mistake in this particular. It is said that the instrument of the 29th of April, 1812, induced the court to sanction the sale of the whole, which it otherwise would not have done. But the court had previously decreed the sale of the whole, or ‘ such part of the property in the proceedings mentioned as may be sufficient to pay the sums due from William Mitchell to the heirs of James Mitchell,’ excepting Cooley’s Fishery; and no more having been sold than was thus authorized by the decree, the ratification of the sale certainly could not be objected to on that account. It has long been the course of the court to ratify sales at once, with the consent of all concerned; and the instrument of the 29th of April, 1812, in reference to that practice, merely indicated that there would be no opposition to a ratification from those parties. But it is the habit of this court, for convenience, to carry to market property which, in a subsequent part of the cause, perhaps, it would have been unnecessary to sell; looking at its own powers of setting right the interests of all parties as among each other. The court often directs real estate to be sold before it can know the real situation of the personal estate, (j) *599 And even supposing it to be true, that the instrument of the 29th of April, 1812, had an influence upon the trustee and the Chancellor in, making and finally ratifying the sale, they were certainly right in thus consulting the convenience of the parties. And if, in truth, more land had been improperly sold than was absolutely necessary to meet the purposes of the suit, it is clear that a purchaser cannot be allowed to come in and object to the sale on that account. (k)
I am, therefore, of opinion that the validity of this sale to Freeborn Brown cannot be affected by any thing that has been shewn on this ground.
This purchaser asks a recision of the sale, in the next place, upon the ground that suits have been instituted in which it is alleged, and appears that neither the late James Mitchell, the ancestor of the two plaintiffs, nor the late William Mitchell, the ancestor of the defendants, to the decree of the 10th of March, 1812, under which the land was sold, had any title to it; and that in one of those suits, an action of ejectment, a judgment had been entered against the casual ejector, and Freeborn Brown had been actually turned out of possession; and, therefore, as the court cannot make to this purchaser a good title, he ought not to be compelled to pay the purchase money.
In England, it seems that when lands are decreed to be sold, the court, in most instances, undertakes to sell a good title; and, therefore, it is common, in such cases, to make a reference to a master to see whether a good title can be made or not to the purchaser, who will not be compelled to take a doubtful title. (l) In Maryland, the course has always been different; here, as to all judicial sales, the rule caveat emptor applies, (m) The court, in no case, undertakes to sell any thing more than the title of the parties to the suit; and consequently it allows of no inquiry into the title at the instance of a purchaser, or any one else. The court makes no warranty, of any kind, of the title sold by its trustee; and, therefore, cannot listen to any objection as to defect of title, or be involved in any inquiry into its validity, (n)
*600 The operation of this general rule is, in many respects, mutually beneficial; for, as on the one hand, the court, by selling only the title of the parties to the suit, and giving no warranty, involves itself in no expensive, dilatory, and troublesome inquiries into the validity of the title; so on the other hand, the purchaser is not answerable for any irregularity of the court, nor for any disposition which it may make of the purchase money; he has a right to presume that the court has acted correctly in decreeing a sale. But as the court offers, and he takes no more than the title of the parties to the suit, it is his duty to see that all who have an interest in the property, and whose right ought to be bound by the decree, have been made parties to the suit for that purpose, and have been concluded by the decree under which he buys. And it is also necessary, for the same reason, that the purchaser should ascertain for himself whether or not the title of those parties may not be impeached or superseded by some other and paramount title. For he has no right to call upon the court to protect him from a'title not in issue in the case, and no way affected by the decree. (o)
Here I might stop and pronounce a final decree, that these two bills be dismissed. But it has been urged that the Harford County Court, although clothed with power, in all respects equal and concurrent with this court, had, in effect, no jurisdiction of this matter; because it was merely a branch of a suit then depending here; and because the prosecution of these suits in that court thwarted and was incompatible with the regular progress of the suit here embracing the same subject.
It is obviously necessary for the public good, that the several courts of justice of our system, should never allow themselves to be brought in collision with each other. And, in general, they are so well ordered as to all matters of common law, that they cannot cross each other in any way whatever. Unfortunately, however, the sphere of each one having concurrent equity jurisdiction has not been so well described as to prevent occasional interferences, even where there exists the most decided intention in each to confine itself strictly within its own orbit.
Soon after I came here I was made sensible of the necessity of great care and vigilance in order to steer clear of any collision *601 with my co-ordinate neighbours, and yet have not been able to do so upon all occasions; because of the facts of the case not having been folly disclosed in the first instance. In a case where the plaintiff merely represented that he had become the debtor of the defendant by bond, on which judgment had been obtained at law, without giving him all the credits to which he was equitably entitled ; I granted an injunction to stay the proceedings at law. But on its being clearly shewn by the answer, that the plaintiff" at law was suing there on a bond he had taken as a trustee under a decree of the county court of equity, I not only dissolved the injunction, but dismissed the bill with costs, on the ground that the proceedings upon the bond were properly a branch of a suit depending in another court of equity with whose movements this court ought not to intermeddle. But on another occasion, when I had passed a decree for the payment of a sum of money, and the party had sued out a fieri facias, a county court granted an injunction to stop the further proceedings upon that fieri facias. In that case the collision was palpable and direct. I determined, however, to submit, and without pressing the conflict, which could have been attended with no good effect, to leave the error to be corrected by the county court itself.
The recollection of these circumstances, has suggested the propriety of explaining my views upon this subject more fully than might otherwise have been deemed necessary.
It has been thought by some, that where any one court of competent authority, had in any manner expressed an opinion on a subject, every other court having no more than a concurrent jurisdiction, was thereby precluded from taking cognizance of the same matter. But it is believed, that the general rule is not so entirely comprehensive.
It is certain, that a judgment or decree upon any matter put in issue between the same parties, in relation to the same subject, is a complete bar to any subsequent suit for the same matter. So too, after a suit has been instituted, and is then depending in any court of competent jurisdiction in this state, though it is not so with regard to a suit in a foreign court, no other suit can be maintained for the same subject between the same parties, (p) And even if the one suit be brought in a court of common law, and the other in equity, to prevent such duplicate vexation, the Court *602 of Chancery will put the plaintiff to his election, and compel him to abandon the one suit or the other, (q)
These rules can only apply where the parties and the subject are the same in both suits; but if there be any essential differences between the two, either as to parties, or subject of controversy, as in the cases under consideration, other reasons and principles apply. ' ■
It has been said, that where an injunction had been refused by the Chancellor, it could not be granted by a county court upon the same case; or the reverse. This opinion seems to be sufficiently well founded, if referred to a case in which the first bill is actually depending at the time when the second application is made to the co-ordinate court; or where, on hearing of the parties, or by default, the one court has refused or dissolved the injunction upon the same case, in which an injunction is asked for in the other court. Because, if all that had been done in the one court, was to go for nothing in the other, a party might in every instance, as a matter of course, avail himself of all the delay to be had in the one court, and then take advantage of the identical same means of procrastination in the other court, after a solemn judgment had been pronounced there upon his case, without resorting to the regular course of setting that judgment right. (r)
But an injunction is, in its effects and consequences, in many respects, analogous to a prohibition. The object of an injunction is to protect the citizen from harm, by acting upon the person complained of. The same object is, in many instances, intended to be accomplished by a prohibition, which acts immediately upon the inferior tribunal; (s) a party may apply to each one of the superior courts, in succession for a prohibition; and his ex parte application having been refused by one, is of itself, no ground for its being rejected by any other of them. (t) . I therefore do not see why, upon the same principles, a citizen might not be allowed to take his chance, by a first ex parte application of obtaining an injunction from each one of the courts having jurisdiction of his case, in like manner as he is allowed to apply to each one. for a prohibition, without prejudice from having been refused by another of them; particularly as the statute (u) does not require an injunction *603 bill to stay waste or proceedings at law, to be filed before the subpoena is issued. (w)
Under our government, the federal courts and the state courts have, in many instances, a concurrent jurisdiction; and either may have cognizance of the case, either as a court of common law or of equity. If the plaintiff and the defendant be citizens of different states, the suit may be brought in either; but if the suit be instituted in a state court, its proceedings will not be stayed 'by an injunction from a federal court; or the reverse; not because the court has not jurisdiction of such a subject between those parties; but because it could not exercise its jurisdiction in that case, without bringing itself injuriously in conflict with another tribunal, with whom it ought not on any account to interfere. (x)
The two great co-ordinate courts of equity of England, are the High Court of Chancery, and the Court of Exchequer. The first is the prototype of this court. The Exchequer, as the phrase is, has two sides; it is a court of common law, as well as of equity. It is composed of a plurality of judges ; and is, in all respects, a term court; being in these particulars, essentially different from the Court of Chancery; which is composed of only one judge, and is most emphatically, always open. The Exchequer, like our federal circuit courts, and our state county courts, is so organized, that it can exercise scarcely any of its equity powers, except in term time; and owing to the delays and expense of proceeding with its equity business only from term to term, the continually open Chancery Court, has a most decided advantage over the Exchequer, which, on that account, is almost deserted as a court of equity, (y)
In this, and other respects, the analogy between the High Court of'Chancery, and the Court of Exchequer of England, as co-ordinate courts of equity, and the High Court of Chancery, and the county courts of equity of Maryland, as co-ordinate courts of the same description, is so close and striking, that the cases in relation to the conflicts of jurisdiction, between those English courts, may be applied as most instructive illustrations of the effects of any similar clashing between our own co-ordinate courts of equity.
It is a rule between those English courts, that where they have both an entirely concurrent jurisdiction of the same matter, that *604 court is entitled to retain the suit which has been first commenced. There are some early instances of disputes between those tribunals in which the one has issued its injunction against the officers of the other. But latterly, there is no instance of either having enjoined a party from proceeding in the other. That court in which the suit has been last instituted, or in which the proceedings are least comprehensive and perfect, has, in general, given way to the other; or forced the parties to betake themselves to that court in which the first suit was instituted, or where the most perfect proceedings were then depending. But after a bill to redeem a mortgage has been filed in one court, a bill to foreclose may be brought in the other; and a cross bill may be filed in chancery to an original bill in the Exchequer ; and so too, either court will retain its suit, when the bill in the other has been dismissed, (z)
But there is no instance to be met with in which either one of the English courts has ever attempted to hinder or stay any part of the proceedings in a suit which had been rightfully instituted, and was then progressing in the other; as by enjoining a trustee proceeding in the direct execution of a decree; or staying a proceeding by execution to enforce the payment of money decreed to be paid; nor has it been ever intimated, that either of those courts would call before it the parties to a suit depending in the other to give an account of acts done under the authority of the other; or to have the money or property with which the other was dealing, or which was in the hands of its officers or agents, brought in to be there disposed of by itself. Yet all this should have been considered and adjudged as settled and correct, as between those English courts in order to sanction, by mere analogous authority, what appears, by these proceedings, to have been done by the Harford County Court.
From these proceedings it appears, that there never has been before that court any defendant who had in reality any thing more than a bare pro forma interest in the matter in controversy; for I put out of the question Kent Mitchell of whom the plaintiffs made no complaint, and did not charge as a party. James Wallace, *605 the defendant to these bills, was no more than an agent of this court, who might have been removed at its pleasure. He had no interest of his own in the matter. Had he been removed there would then have been no one against whom that court could have proceeded with effect; or had he been permitted to remain, no decree against him alone could have bound the rights of the real parties to the original controversy who were no parties to the bills in Harford County Court. Had James Wallace, as a trustee, collected any money as the proceeds of the sale he made under the decree of this court, that court could no more have ordered it to have been brought in and paid over, than it could have taken money levied and held officially by a sheriff of an adjacent county under an execution from his own county court; or money held officially by the messenger or register of this court, (a) If Harford County Court could not have exercised powers to the whole of this extent, it is evident, that the bills which that court allowed to be filed, and required to be answered by James Wallace, the trustee of this court, should have been dismissed at once.
These proceedings are not only incompatible with, and calculated to cross and thwart the proceedings of this court, but they were absolutely useless, and needlessly troublesome; because it is manifest, that they could have resulted in no effectual relief; and because this court could have reached, in the most effectual manner, all the objects aimed at by those bills much more expeditiously, and at a far less expense. Of all this, had this case been brought to a final hearing before Harford County Court, I am satisfied, it might and would have been convinced, and upon that conviction would, without hesitation, have dismissed these bills.
Therefore, without revising or reversing any thing which has been heretofore done by that court, I am of opinion, that in consolidating and dismissing these bills, I do no more than would have been done by that tribunal, as well upon the merits, as upon the ground of the incompatibility of the proceeding with the suit now depending in this court.
Whereupon it is Decreed, that the several bills of complaint filed in Harford County Court by the late Freeborn Brown and William Brown be, and the same are hereby consolidated and treated as parts of the bill filed on the 5th of March, 1825, as if the same had been filed on the 8th of May, 1818. And it is further De *606 creed, that the injunction heretofore granted in this case be, and the same is hereby annulled and dissolved. And it is' further Decreed, that the bill of complaint of the complainants as herein before consolidated, be, and the same is hereby dismissed with costs to be taxed by the register.
See this case as reported in 4 G. & J. 479.

 Waite v. Temple, 1 Cond. Cha. Rep. 162.

 Tyson v. Hollingworth, ante 334, note.

 Powell Mortg. 547, n. R.

 Townshend v. Stangroom, 6 Ves. 328; Higginson v. Clowes, 15 Ves. 516; Clowes v. Higginson, 1 Ves. & Bea. 524.

 Shovel v. Bogan, 2 Equ. Ca. Abr. 688.

 Carter v. Campbell, Gilmer’s Rep. 159.

 Townshend v. Stangroom, 6 Ves. 340; Winch v. Winchester, 1 Ves. & Bea. 375; Portman v. Mill, 3 Cond. Cha. Rep. 238; Hoffman v. Johnson, 1 Bland, 109; Land Hol. Ass. 253; Andrews v. Scotton, post.

 Weems v. Brewer, 2 H. & G. 397.

 Holme v. Stanley, 8 Ves. 1; Lloyd s. Johnes, 9 Ves. 65; Hammond v. Hammond, ante 359.

 Lutwych v. Winford, 2 Bro. C. C. 248; Burke v. Crosbie, 1 Ball & Bea. 501.

 Marlow v. Smith, 2 P. Will. 198; Shaw v. Wright, 3 Ves. 22; Noel v. Weston, Coop. Rep. 138 ; Coffin v. Cooper, 14 Ves. 205 ; Roffey v. Shallcross, 4 Mad. 227; Eyton v. Dicken, 2 Exch. Rep. 118.

 Ridgely v. Gartrell, 3 H. & McH. 450; The Monte Allegre, 9 Wheat. 644: Finley v. Bank U. S., 11 Wheat, 307.—

 Toulmin v. Steere, 3 Meriv. 223; Palmer v. Humphrey, Cro. Eliz. 584; Gilbert Execu. 35; 2 Harri. Pra. Cha. 150; 1 Newl. Pra. Cha. 330.

 Giffard v. Hort, 1 Scho. & Lefr. 386; Bennett v. Hamill, 2 Scho. & Lefr. 566; Lloyd v. Johnes, 9 Ves. 65; Curtis v. Price, 12 Ves. 105.

 Bowne v. Joy, 9 John. Rep. 221; Walsh v. Durkin, 12 John. Rep. 99.

 1 Newt. Pra. Cha. 246.

 Reynolds v. Pitt, 19 Ves. 138.

 Eden Inj. 3.

 Smart v. Wolff, 3 T. R. 340; Forum Rom. 55.

 4 Ann. C. 16, s. 22; Kilty Rep. 247.

 Williams v. Hall, 1 Bland, 193, note.

 Diggs v. Wolcott, 4 Cran. 179; McKim w. Voorhies, 7 Cran. 279.

 Crowley’s Case, 2 Swan. 11; 1 London Jurist, art. 7.

 Vendall v. Harvey, Nelson, 19; Newburg v. Wren, 1 Vern. 220; Nicholas v. Nicholas, Prec. Cha. 546; Coysgarne v. Jones, Amb. 613; Bullock v. Bullock, 3 Swan. 698 ; Jackson v. Leaf, 1 Jac. & Wal. 232; Harrison v. Gurney, 2 Jac. & Wal. 563; Glegg v. Legh, 4 Mad. 192; Bushby v. Munday, 5 Mad. 297; Parker v. Leigh, 6 Mad. 115; Pitcher v. Rigby, 4 Exch. Rep. 30; Myddleton v. Rushout, 1 Eccles; Rep. 81; Kibblewhite v. Rowland, 3 Eccles. Rep. 412, note, s. 543; 1 Fowl. Exch. Pra.270; 1 Mad. Cha. 128.

 Jones v. Jones, 1 Bland, 461; Alston v. Clay, 2 Hayw. 171.